## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

ANDREA M. JOHNSON,

         *Plaintiff*,

v.

COMMISSIONER OF SOCIAL SECURITY,

         *Defendant*.

_____/

CIVIL ACTION NO. 2:16-cv-10013

DISTRICT JUDGE STEPHEN J. MURPHY, III

MAGISTRATE JUDGE PATRICIA T. MORRIS

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (Docs. 17, 19)

### I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Johnson is not disabled. Accordingly, **IT IS RECOMMENDED** that Johnson's Motion for Summary Judgment, (Doc. 17), be **DENIED**, the Commissioner's Motion, (Doc. 19), be **GRANTED**, and that this case be **AFFIRMED**.

### II.    REPORT

#### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned Magistrate Judge for the purpose of reviewing a final decision by the Commissioner of Social Security ("Commissioner") denying Plaintiff Andrea Johnson's ("Johnson") claim for a period of disability and Supplemental Security Income Benefits ("SSI")under Title XVI, 42 U.S.C. § 1381 *et seq.*

1

(Doc. 5). The matter is currently before the Court on cross-motions for summary judgment. (Docs. 17, 19).

Plaintiff previously filed several applications for SSI on October 30, 1995, October 15, 2002, and June 3, 2005, which were denied at the initial level on January 9, 1996, March 13, 2003, and October 4, 2005, respectively. (Tr. 161). On October 27, 2010, ALJ Ethel Revels issued a partially favorable decision regarding her October 4, 2015, application, finding Johnson disabled from June 28, 2009, to June 30, 2010. (Tr. 211-29). Johnson did not appeal the decision, and it thus became binding upon all parties.

On July 5, 2013, Johnson filed a renewed application for SSI, alleging a disability onset date of August 1, 2011. (Tr. 289-94). The Commissioner denied her claim. (Tr. 233-42). Johnson then requested a hearing before an Administrative Law Judge ("ALJ"), which occurred on November 14, 2014 before ALJ Ena Weathers. (Tr. 177-206). At the hearing, Johnson—represented by her attorney, Dannelly Smith—testified, alongside Vocational Expert ("VE") Luann Castellana. (*Id.*). The ALJ's written decision, issued February 11, 2015, found Johnson not disabled. (Tr. 161-72). On October 29, 2015, the Appeals Council denied review, (Tr. 1-6), and Johnson filed for judicial review of that final decision on January 4, 2016. (Doc. 1).

### B.    Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in

2

the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* at 286 (internal citations omitted).

### C.      Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the

4

Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

Under the authority of the Social Security Act, the SSA has promulgated regulations that provide for the payment of disabled child's insurance benefits if the claimant is at least eighteen years old and has a disability that began before age twenty-two (20 C.F.R. 404.350(a) (5) (2013). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered her unable to engage in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). The regulations provide a five-step sequential evaluation for evaluating disability claims. 20 C.F.R. § 404.1520.

### D. ALJ Findings

Following the five-step sequential analysis, the ALJ found Johnson not disabled under the Act. (Tr. 161-72). At Step One, the ALJ found that Johnson had not engaged in substantial gainful activity since her application date of July 5, 2013. (Tr. 164). At Step Two, the ALJ concluded that the following impairments qualified as severe: "major depression with psychotic features, generalized anxiety disorder, lumbar spondylosis and obesity . . . ." (*Id.*). The ALJ also decided, however, that none of these met or medically equaled a listed impairment at Step Three. (Tr. 165-67). Thereafter, the ALJ found that Johnson had the residual functional capacity ("RFC") to perform light work with the following additional limitations:

5

> [T]he claimant is unable to climb ladders, ropes and scaffolds; she can perform simple, routine, repetitive tasks without a strict production pace demand; the claimant is able to occasionally interaction [sic] with coworkers and occasional to superficial interaction with the general public; she can occasionally stoop and crouch; the claimant is able to occasionally push and pull with the lower extremity, especially on the left; and she must have the ability to change from a seated to standing position or vice versa for 1 to 2 minutes every two hours, without interference with work product.

(Tr. 167). At Step Four, the ALJ found that Johnson had not engaged in any relevant prior work. (Tr. 171). Proceeding to Step Five, the ALJ determined that "there are jobs that exist in significant numbers in the national economy that the claimant can perform." (Tr. 171-72).

### E.  Administrative Record

#### 1.  Medical Evidence

The Court has reviewed Johnson's medical record. In lieu of summarizing his medical history here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

#### 2.  Application Reports and Administrative Hearing

##### i.  Function Report

On August 4, 2013, Johnson filled out a Function Report. (Tr. 310-17). In describing her condition, she provided a litany of symptoms: "crying spells, panic attacks, hear voice whispering, always depressed, . . . don't want to do anything, . . . like [she is] in a twilight zone, mind tired," and feeling "empty," "lost," and "disappointed about life." (Tr. 310). In a typical day, she "tr[ies] to look at [the] T.V. a little," but her "mind [is] still tired" and she is "still depressed . . . ." (Tr. 311). She will "talk to [her]

6

daughters on [the] phone and cry," and "walk around the house." (*Id.*). She indicated that she did not take care of anyone else, or any pets. (*Id.*). Before her onset date, she would "enjoy life," "go to the movies," "be happy," "cook for [her]self," and "wash [her] clothes." (*Id.*). "[W]ithout [A]tvan [sic] I will not sleep good" and "won't be sleepy." (*Id.*). Although she can dress and bathe on her own, albeit without "want[ing] to," her daughter helps her care for her hair, cook, and shop. (Tr. 311-13). She also cannot do house or yard work. (Tr. 312). And she cannot use a checkbook, although she remains capable of paying bills, counting change, and handling a savings account. (Tr. 313).

Despite a mostly sedentary life, Johnson says she goes outside once or twice a week, using public transportation or riding in a car, though she will not drive because her depression interferes with her capacity to "pay attention to the [road]." (Tr. 313). She has no hobbies or interests. (Tr. 314). Once a week, however, she spends time at a grief class. (*Id.*). In marking specific issues her conditions cause, Johnson notes difficulty talking, concentrating, completing tasks, remembering, understanding, and following instructions. (Tr. 315). She can walk "maybe" two blocks before resting for fifteen to twenty minutes. (*Id.*). She can pay attention for about fifteen minutes, and this, alongside her other difficulties, she attributes to depression. (*Id.*). In the final "Remarks" section, Johnson notes that her only son was killed and robbed at seventeen years old. (Tr. 317).

Johnson's daughter, Kiesha, also filled out a Function Report. (Tr. 325-332). The report is consistent with Johnson's, and rounds out the facts in Johnson's case a bit. Kiesha notes that Johnson "watches a little T.V. and talks about the things she's worried about and depressed about." (Tr. 326). She notes that Johnson has become "very

7

dependent on her sleeping medication," and confirms that she helps Johnson care for her hair and cook. (*Id.*). She also clarifies that her and her sibling "finance all of her bills, and [Johnson] doesn't have a checkin[g] or saving account because [they] shop for her." (Tr. 328). Near the end of the report, Kiesha added that "ever since my mother lost my brother that was robbed[,] shot and killed, I feel that she is very depressed, stressed and suicidal and has no desire or hope for life anymore. And she hasn't been the same since, . . ." (Tr. 332).

### ii.        Johnson's Testimony at the Administrative Hearing

At her hearing before ALJ Ena Weathers, Johnson's attorney indicated that Johnson had been "hospitalized four times since December 2012," and that since her son was killed, "she's been hospitalized six times." (Tr. 182). Johnson confirmed that she did not currently receive income, nor had a driver's license. (Tr. 184-85). She had not worked a job for twenty years, and now her daughter helped care for her "a little bit." (Tr. 186). When asked why she no longer works, Johnson replied that she is "too depressed" and "just feel[s] hopeless" because she is "living in a twilight zone. Not doing good." (Tr. 187).

Johnson indicated that she continued to see Dr. Purohit on a regular basis, and had been for approximately fifteen years. (*Id.*). She received medication from him, and engaged in talk therapy with a separate therapist "every three months." (*Id.*). Treatment revolved around her diagnosis of major depression, for which she had been taking Risperdal for "maybe about five, six years," though she also suggested that she had not noticed any difference after treatment. (Tr. 188-89). As a result, Dr. Purohit increased the

8

dosage six months before the hearing. (Tr. 189). In short, Johnson attributes her mood to her son's death: "I can't accept it. I'm not going to accept it. I just feel like I'm dying slowly." (Tr. 190).

In addition to her emotional state, Johnson noted problems with her back. "My leg is numb from the calf all the way down to my foot. . . . And then I get pains in my, all through there. And I cannot stand up long. I cannot stand up over, maybe, two minutes or so. Because it's real, real, hurting." (Tr. 191). On a one to ten scale, Johnson placed her back pain at "about a seven. . . . Like somebody stuck a knife in my leg." (Tr. 192). To alleviate her pain, she takes "two Norcos," as well as additional medications. (*Id.*). The medication allows her to sit. "I know I'm probably overdosing, but I have to do what I can." (Tr. 194). However, she can only sit for "maybe 10 minutes" continuously. (*Id.*).

Johnson then described her typical day. She would rise at sometime between 8:00 A.M. and 9:00 A.M., and would "[l]ook at a little TV, turn it off and on. And just be depressed." (Tr. 195). She had trouble paying attention to any programs. (Tr. 196-97). Her daughter, who would try to "come over every day," would "prepare[] [her] something to eat." (Tr. 195-96). Then she usually would get dressed, though "sometimes [she] do[es]n't want to." (Tr. 195). When she would tire of the television, she would "[l]ay down all day. And just think about [her] son" who died in 2009. (*Id.*). The medicine would help her sleep. (Tr. 195-96). Nevertheless, she acknowledged hesitance in the past about increasing her medication dosage, particularly with Celexa. (Tr. 198). She used to attend group therapy about twice a month before it was "shut down." (Tr.

198-99). Her son had been killed around the group therapy site, so she did not like going there. (Tr. 199).

### iii.        The VE's Testimony at the Administrative Hearing

The ALJ then called upon the services of VE Luann Castellana to determine Johnson's ability to perform work. (Tr. 200). The VE noted, as an initial matter, that Johnson had no relevant prior work. (Tr. 201). Commencing Step Four of her analysis, the ALJ asked the VE to assume a hypothetical individual able to "work at all exertional levels" except that "she would be unable to climb ladders, ropes or scaffolds, could perform simple, routine, repetitive tasks without strict production demands, with occasional interaction with co-workers, and occasional-to-superficial interaction with the general public." (Tr. 201-02). The VE noted that certain jobs at the medium range would be appropriate, particularly "laundry worker," with 1,200 regional jobs and 97,00 national jobs available. (Tr. 202). Another appropriate job would be that of "cleaner[]," with 2,000 regional and 125,000 national jobs available. (*Id.*). The VE then gave some "light examples," including "sorting and inspecting jobs"—with 2,500 regional and 250,000 national jobs available—as well as "packaging and bagging type jobs"—with 2,000 regional and 250,000 national jobs available. (Tr. 202-03).

The ALJ then proceeded to her second hypothetical, keeping everything from the first hypothetical but adding "the additional limitation that the hypothetical person would have occasional stooping and crouching, occasional push and pull with the lower extremity, especially on the left. And the ability to change from a seating to a stand up

10

position. . . . for one to two minutes every two hours without interference with work product." (Tr. 203). In response, the VE said that such a limitation would preclude medium range jobs, but indicated that reduced numbers of packaging and bagging jobs would remain available—1,000 regional and 125,000 national jobs, in other words, would remain suitable for such a hypothetical person. (Tr. 203-04). "Sorting and inspecting" jobs would also be available, with 1,200 regional and 120,000 national availabilities. (Tr. 204). The VE also identified "assembly jobs" that would exist, with about 1,200 regional jobs and 100,000 national jobs available. (*Id.*). Although the "changing positions would [not be] described in the Dictionary of Occupational Titles," the VE's "background and experience" informed her predictions. (*Id.*).

In hypothetical three, the ALJ professed similarity to hypothetical two except that "the hypothetical individual would be off-task 25 percent of the work day, excluding normal breaks due to lack of concentration, pain, and the effects of medication." (Tr. 205). The VE recognized that such a limitation would "eliminate all competitive full-time work, . . ." (*Id.*).

### F.     Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who

are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.*. When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); *see also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting

13

objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p, 1996 WL 374186 (July 2, 1996). Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*,

14

749 F.2d 1066, 1071 (3d Cir. 1984)) (internal quotation marks omitted), a claimant's description of his or her physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996). Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

>  (i)    [D]aily activities;
>  (ii)   The location, duration, frequency, and intensity of . . . pain;
>  (iii)  Precipitating and aggravating factors;
>  (iv)   The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
>  (v)    Treatment, other than medication, . . . received for relief of . . . pain;
>  (vi)   Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996).

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20

C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

In the Sixth Circuit, a prior decision by the Commissioner can preclude relitigation in subsequent cases.

> When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding.

SSAR 98-4(6), 1998 WL 283902, at *3 (acquiescing to *Drummond v. Commissioner*, 126 F.3d 837 (6th Cir. 1997)). The regulations also explicitly invoke *res judicata*: An ALJ can dismiss a hearing where "res judicata applied in that we have a previous [final] determination or decision under this subpart about your rights." 20 C.F.R. §§ 404.957, 416.1457. Collateral estoppel is the branch of *res judicata* applied in this context. As the Third Circuit explained, *res judicata* formally "consists of two preclusion concepts: issue preclusion and claim preclusion." *Purter v. Heckler*, 771 F.2d 682, 689 n.5 (3d Cir. 1985); *see also Groves v. Apfel*, 148 F.3d 809, 810 (7th Cir. 1998) (discussing the "collateral estoppel branch of res judicata" in social security cases). Claim preclusion prevents reviewing a judgment on the same cause of action; issue preclusion, or collateral

estoppel is less expansive: "foreclosing relitigation on all matters that were actually and necessarily determined in a prior suit." *Purter*, 771 F.2d at 689 n.5.

The *res judicata* effect of past ALJ decisions is actually a form of collateral estoppel precluding reconsideration of discrete factual findings and issues. *See Brewster v. Barnhart*, 145 F. App'x 542, 546 (6th Cir. 2005) ("This Court will apply collateral estoppel to preclude reconsideration by a subsequent ALJ of factual findings that have already been decided by a prior ALJ when there are no changed circumstances requiring review."). The Commissioner's internal guide explains the different issues and factual findings precluded by *res judicata* under *Drummond*. *See Soc. Sec. Admin., Hearings, Appeals, and Litigation Law Manual*, § I-5-4-62, 1999 WL 33615029, at *8-9 (Dec. 30, 1999). These include the RFC and various other findings along the sequential evaluation process, such as "whether a claimant's work activity constitutes substantial gainful activity," whether she has a severe impairment or combination of impairments, or whether she meets or equals a listing. *Id.*

Evidence of "changed circumstances" after the prior decision allows the ALJ to make new findings concerning the unadjudicated period without disturbing the earlier decision. *See Bailey ex rel. Bailey v. Astrue*, No, 10-262, 2011 WL 4478943, at *3 (E.D. Ky. Sept. 26, 2011) (citing *Drummond*, 126 F.3d at 842-43). In other words, even though the first ALJ did not make any findings concerning later periods, her decision still applies to those periods absent the requisite proof of changed circumstances. Thus, as applied in this Circuit, the SSAR 98-4(6) and *Drummond* essentially create a presumption that the facts found in a prior ruling remain true in a subsequent unadjudicated period unless

17

"there is new and material evidence" on the finding. *See Makinson v. Colvin*, No. 5: 12CV2643, 2013 WL 4012773, at *5 (N.D. Ohio Aug. 6, 2013) (adopting Report & Recommendation) ("[U]nder *Drummond* and AR 98-4(6), a change in the period of disability alleged does not preclude the application of *res judicata*." (citing *Slick v. Comm'r of Soc. Sec.*, No. 07-13521, 2009 U.S. Dist. LEXIS 3653, 2009 WL 136890, at *4 (E.D. Mich. Jan. 16, 2009))); *cf. Randolph v. Astrue*, 291 F. App'x 979, 981 (11th Cir. 2008) (characterizing the Sixth Circuit's rule as creating a presumption); *Chavez v. Bowen*, 844 F.2d 691, 693 (9th Cir. 1988) ("The claimant, in order to overcome the presumption of continuing nondisability arising from the first administrative law judge's findings of nondisability, must prove 'changed circumstances' indicating a greater disability." (quoting *Taylor v. Heckler*, 765 F.2d 872, 875 (9th Cir. 1985))).

In *Drummond*, for example, the court held that the first ALJ's RFC applied to a subsequent period unless the circumstances had changed. 126 F.3d at 843; *see also Priest v. Soc. Sec. Admin.*, 3 F. App'x 275, 276 (6th Cir. 2001) (noting that in order to win benefits for a period after a previous denial, the claimant "must demonstrate that her condition has so worsened in comparison to her condition [as of the previous denial] that she was unable to perform substantial gainful activity"); *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1232-33 (6th Cir. 1993) (same). The Sixth Circuit made this clear in *Haun v. Commissioner of Social Security*, rejecting the argument that *Drummond* allowed a second ALJ to examine *de novo* the unadjudicated period following the first denial. 107 F. App'x 462, 464 (6th Cir. 2004).

18

To overcome the presumption that the claimant remains able to work in a subsequent period, the claimant must proffer new and material evidence that her health declined. The Sixth Circuit has consistently anchored the analysis on the comparison between "circumstances existing at the time of the prior decision and circumstances existing at the time of the review . . . ." *Kennedy v. Astrue*, 247 F. App'x 761, 768 (6th Cir. 2007). In a case predating *Drummond*, the court explained. "[W]hen a plaintiff previously has been adjudicated not disabled, she must show that her condition so worsened in comparison to her earlier condition that she was unable to perform substantial gainful activity." *Casey*, 987 F.2d at 1232-33. Later, it reiterated, "In order to be awarded benefits for her condition since [the previous denial], Priest must demonstrate that her condition has . . . worsened in comparison to her [previous] condition . . . ." *Priest*, 3 F. App'x at 276. The ALJ must scan the medical evidence "with an eye toward finding some change from the previous ALJ decision . . . ." *Blackburn v. Comm'r of Soc. Sec.*, No. 4:1-cv-58, 2012 WL 6764068, at *5 (E.D. Tenn. Nov. 14, 2012), *Report & Recommendation adopted by* 2013 WL 53980, at *1 (Jan. 2, 2013). That is, the evidence must not only be new and material, but also must show deterioration. *Drogowski v. Comm'r of Soc. Sec.*, No. 10-12080, 2011 U.S. Dist. LEXIS 115925, 2011 WL 4502988, at *8 (E.D. Mich. July 12, 2011), *Report & Recommendation adopted by* 2011 U.S. Dist. LEXIS 110609, 2011 WL 4502955, at *4 (Sept. 28, 2011). In *Drogowski*, for example, the court rejected the plaintiff's argument that a report met this test simply because it was not before the first ALJ. *See* 2011 WL 4502988 at *2, 8-9. These decisions make clear

that the relevant change in circumstances is not a change in the availability of evidence but a change in Plaintiff's condition.

*Res judicata* is not a complete bar on reconsidering prior decisions or determinations: the regulations provide two mechanisms for such reexamination that escape the doctrine's effects. *Purter*, 771 F.2d at 691-93 (discussing reopening as an exception to claim preclusion). The first, less important to *res judicata* case law, occurs just after the initial determination, when the claimant's first step in the review process is sometimes a request for "reconsideration" of that decision. 20 C.F.R. §§ 404.907, 416.1407.

The more critical and complicated mechanism is reopening a prior ALJ decision. The regulations allow the Commissioner, through an ALJ or Appeals Council, to peel back the determination or decision and revise it. 20 C.F. R. §§ 404.987, 404.992, 416.1487, 416.1492. The claimant or the Commissioner can initiate the process. *Id.* The reopening of a determination or decision can occur "for any reason" within twelve months of the notice of the initial determination, but "good cause" must exist if the reopening occurs within two years of the initial determination for SSI claims and four years for DIB claims. *Id.* §§ 404.988, 416.1488. A DIB claim can also be reopened at any time under a few scenarios not relevant to the instant case. *Id.* § 404.988(c). Good cause exists, among other reasons, if "[n]ew and material evidence is furnished" for either type of claim, SSI or DIB. *Id.* §§ 404.989, 416.1489. If a determination or decision is reopened, *res judicata* does not apply. *Kaszer v. Massanari*, 40 F. App'x 686, 690 (3d Cir. 2002).

20

The decision whether to reopen, unless it implicates a colorable constitutional issue, evades judicial review: courts can only review the Commissioner's final decisions made after a hearing. *See* 42 U.S.C. § 405(g); *Califano v. Sanders*, 430 U.S. 99, 108-09 (1977) (holding that Commissioner's decision not to reopen is unreviewable). However, courts may review a decision not to reopen a case "to determine whether *res judicata* has been properly applied to bar the pending claim or whether, even though *res judicata* might properly have been applied, the prior claim has nevertheless been reopened." *Tobak v. Apfel*, 195 F.3d 183, 187 (3d Cir. 1999); *see also Kaszer,* 40 F. App'x at 690 ("But 'we will examine the record to determine whether or not a reopening has occurred.'" (quoting *Coup v. Heckler*, 834 F.2d 313, 317 (3d Cir. 1987))).

Implicit reopenings occur, with unfortunate frequency, where the ALJ crafts a decision that appears to "readjudicat[e] part of the period already adjudicated by the first decision" rather than "adjudicate only the subsequent period." *Gay v. Comm'r of Soc. Sec.*, 520 F. App'x 354, 358 (6th Cir. 2013). As the Sixth Circuit lamented,

> If an ALJ intends to reopen prior decisions, he or she should say so, say why, and cite the appropriate regulation that permits reopening. If an ALJ intends instead to adjudicate only the subsequent period in light of changed circumstances, he or she should make this approach clear and cite the appropriate cases and acquiescence rulings. Regardless of which path the ALJs take, they must clearly state their approach.

*Id.*; *see also Haddix v. Astrue*, No. 10-30, 2010 WL 4683766, at *1-4 (E.D. Ky. Nov. 12, 2010) (remanding where ALJ's decision was unclear).

Constructive reopenings are found where the ALJ reviewed the entire record including the portions from the already adjudicated period, and decided "the merits of the

claim." *Tobak*, 195 F.3d at 186. Thus, the Sixth Circuit found a reopening where the ALJ considered the entire period "in light of the new evidence . . . ." *Wilson v. Califano*, 580 F.2d 208, 212 (6th Cir. 1978). An additional factor that could lead to finding an implicit reopening is the ALJ's failure to discuss the prior determination or the *res judicata* doctrine. *See Martin v. Comm'r of Soc. Sec.*, 82 F. App'x 453, 455 (6th Cir. 2003); *Crady v. Sec'y of Health & Human Servs.*, 835 F.2d 617, 620 (6th Cir. 1987). Nonetheless, an ALJ's review of old or new evidence does not necessarily signify a constructive reopening, for such a review would be required to decide against reopening as well as for it. *See Girard v. Chater*, 918 F. Supp. 42, 44-45 (D.R.I. 1996). The ALJ's discussion of new evidence likewise might relate to her independent determination of whether to grant benefits in the unadjudicated period, again indicating no reopening occurred. *See id.* at 44.

The ability to reopen—explicitly or implicitly—must meet certain regulatory requirements. 20 C.F.R. §§ 404.987-404.996, 416.1487-416.1494. Chief among these is the two year (SSI) and four year (DIB) time limits for good cause reopenings. *Id.* §§ 404.988, 416.1488. Consequently, an ALJ is powerless to reopen a claim outside these periods. *See Glazer v. Comm'r of Soc. Sec.*, 92 F. App'x 312, 315 (6th Cir. 2004) ("Because more than four years had passed since the denial of the original application, the Commissioner could not have constructively reopened Glazer's case.").

### G. Analysis

#### 1. Substantial Evidence Supports the ALJ's Credibility Determination

Johnson takes issue with the ALJ's credibility determination under SSR 96-7p and 20 C.F.R. § 416.929. In particular, she sees the ALJ's reasoning as misconstruing record evidence as inconsistent with Johnson's claims where, in fact, consistency abounds. For instance, the ALJ reads the record as vouching for Johnson's ability to "live independently" and "manage her own affairs" in contradistinction to Johnson's own statements about her capacity to care for herself—yet, according to Johnson, her testimony and Function Report, as well as Kiesha's Function Report, "*all* consistently reflect a large reliance on [Kiesha] to perform much of her daily activities including handling finances." (Doc. 17 at ID 722). Johnson points also to the ALJ's reasoning that "medication improved her symptoms," which ignores the fact that Johnson "was again hospitalized for a suicide attempt" less than three months after "an increase of her medication to the maximum does of Celexa," and that increasing medications "hardly shows improvement." (Doc. 17 at ID 723, 726) (internal quotation marks omitted). And although the ALJ observed that Johnson was "discharged" from hospitalization "without [suicidal] ideations," the ALJ failed to acknowledge that "on discharge[,] [Johnson] was noted to show limited improvement," "her diagnosis continued to be *severe* MDD," and "her GAF scores never exceeded 50." (Doc. 17 at ID 725). In overlooking these facts, Johnson posits that the ALJ improperly discounted her credibility and failed to recognize the functional limitations accompanying her diagnosis of "severe MDD." (Doc. 17 at ID 724-25).

An ALJ must take into consideration a number of factors when evaluating the limitations an applicant's condition might place upon their capacity to work. These

include: "daily activities"; "the location, duration, frequency, and intensity of pain or other symptoms"; "precipitating and aggravating factors"; "the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms"; "treatment, other than medication, received for relief of pain or other symptoms"; "any measures used to relieve pain or other symptoms"; and "other factors concerning functional limitations and restrictions due to pain or other symptoms." *Calvin v. Comm'r of Soc. Sec.*, 437 F. App'x 370, 371 (6th Cir. 2011) (citing 20 C.F.R. § 404.1429(c); SSR 96-7p). "Upon review, we are to accord the ALJ's determinations of credibility great weight and deference . . . ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). This remains true "even if there is substantial evidence in the record that would have supported an opposite conclusion, so long as substantial evidence supports the conclusion reached by the ALJ." *McGlothin v. Comm'r of Soc. Sec.*, 299 F. App'x 516, 521 (6th Cir. 2008) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)) (internal quotation marks omitted).

Although Johnson presents those facts most beneficial to her in an organized and coherent manner, she fails to show that the ALJ's credibility determination lacked substantial evidence. Indeed, the ALJ notes Johnson's hospitalization in December 2012 and June 2013 "when [she] allegedly tried to cut her wrists," the GAF score of 35 assigned her in January 2013, and the GAF scores of 20-25 and 25-30 in June 2013. (Tr. 168). But the ALJ was permitted to favor the GAF scores of 50 from Northeast Guidance Center upon finding that they were "developed over many months and present a more longitudinal and accurate picture of the claimant's overall functional ability." (*Id.*). That

treatment notes from this time in Johnson's life showed "improvement with medication," "frequent denial of suicidal thoughts," and an appropriate social demeanor, are facts that appear prominently in the ALJ's reasoning and buttress her ultimate conclusions. (*Id.*); *e.g.*, (Tr. 444) (noting a denial of suicidal, homicidal, or assault ideations). Johnson intuitively suggests that her heightened medicinal dosage signals an exacerbation of her condition, rather than an improvement—but this argument misses the point that the record shows Johnson's susceptibility to treatment despite such alterations.

The record also validates the ALJ's observations that Johnson's capacity to care for herself improved markedly in recent years. *E.g.*, (Tr. 507) ("Consumer has the ability to live independently and handle her own affairs."); (Tr. 515) (listing Johnson as "[i]ndependent" in activities of daily living). To note that such evidence implies a lesser degree of dependence on Johnson's daughters than her testimony and function reports might suggest is not "disingenuous," (Doc. 20 at ID 768)—rather, it discards Occam's broom and chooses to regard the more nuanced (and accurate) portrait of Johnson's abilities as relevant. And although Johnson's testimony and function reports certainly convey a grim indictment of her abilities, such evidence—when juxtaposed with evidence from medical sources suggesting a higher capacity to operate independently—only serves to corroborate the ALJ's skepticism.[1]

---

[1] The issues of Johnson's medication, comfort in social situations, and ability to operate independently, all appear prominently in her objection to the ALJ's RFC assessment. Rather than discussing the record evidence behind the ALJ's findings twice at length, I reserve space for a more in-depth evaluation of such evidence below, in the context of the ALJ's RFC determination, which reflects helpfully on the ALJ's credibility determination. *See Strevy v. Comm'r of Soc. Sec.*, No. 1:12-cv-634, 2013 WL 5442803, at *2 (W.D. Mich. Sept. 30, 2013) ("The ALJ recited the evidence of record in detail and considered Plaintiff's

## 2.     Substantial   Evidence   Supports   the   ALJ's   RFC Assessment

When the prior decision of ALJ Revels emerged on October 27, 2010, it became binding on all parties. ALJ Revels determined that Johnson's disability began on June 28, 2009, and ended on June 30, 2010. (Tr. 226). As the present ALJ recognized in her opinion, "the issue of disability is *res judicata* through the date of that decision." (Tr. 161). Such decision remains binding in the subsequent unadjudicated period absent a showing of a change in circumstances. Here, however, the ALJ found that "there ha[d] been a change in [Johnson]'s condition" since the prior decision. (Tr. 162). On review, the issue becomes whether the substantial evidence of record supports the ALJ's finding as to these changed circumstances and the revised RFC assessment.

The October 27, 2010, RFC is as follows:

[B]eginning on June 30, 2010, the claimant has had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is limited to simple, repetitive tasks because of moderate limitations in the ability to maintain concentration for extended period, as well as moderate limitations in the ability to understand, remember, and carry out detailed instructions as a result of depression, and anxiety. The work may not involve working with the general public or at a production pace.

(Tr. 226). By contrast, the February 11, 2015, RFC is as follows:

[T]he claimant has the residual functional capacity to perform light work . . . except the claimant is unable to climb ladders, ropes and scaffolds; she can perform simple, routine, repetitive tasks without a strict production pace demand; the claimant is able to occasionally interaction [sic] with coworkers and occasional to superficial interaction with the general public; she can occasionally stoop and crouch; the claimant is able to occasionally push and

---

subjective complaints in light of the entire record, and the ALJ's conclusions were drawn in that context, not in isolation . . . .").

pull with the lower extremity, especially on the left; and she must have the ability to change from a seated to standing position or vice versa for 1 to 2 minutes every two hours, without interference with work product.

(Tr. 167).[2] Johnson's argument gestures toward alleged "fault[s]" in the ALJ's reasoning, in turn questioning the ALJ's refusal to deviate from the prior decision's finding of non-disability beginning June 30, 2010, in a manner favorable to her. (Doc. 17 at ID 728). I address each supposed fault in turn.

First, Johnson recounts that the ALJ's reliance on Dr. Moten, the state agency doctor at the initial level of review, results in discounting her post-2012 hospitalizations and speculating as to her "amenab[ility] to an increase in her Celexa." (Doc. 17 at ID 729). Indeed, following Dr. Moten's evaluation, Johnson notes that her medication dosages were increased, and that "[d]espite the increases in medication, [she] continued to be hospitalized for suicidal ideations." (*Id.*). As the ALJ notes *in discussing* Johnson's post-2012 treatment, however, "[t]he claimant was . . . frequently noted to be low risk and her condition stabilized during treatment." (Tr. 169); (Tr. 528) (October 2013: "Client stated she was feeling depressed because of holidays but she denied suicidal thoughts or plans."); (Tr. 496) (January 2014: noting "[a]dequate" impulse control and judgment, and a denial of suicidal, homicidal, or assault ideations); (Tr. 460) (July 2014: same). While Johnson insists that she was hospitalized in December 2014 for suicidal ideation, (Doc. 20 at ID 769), the record offers few details as to the nature of her visit, or

---

[2] For reasons discussed, *infra*, the ALJ's application of the res judicata doctrine is appropriate. There are two prime changes the new RFC makes to the prior RFC: (1) physical limitations are added, and (2) social limitations are relaxed. Substantial evidence of record undoubtedly supports the first finding—(Tr. 169) (noting evidence of physical limitations and explaining the RFC accommodations for them)—as well as the second. But because Johnson challenges only the second, I confine my discussion thereof to her particular objection.

the length of her stay. (Tr. 593-94) (noting only that Johnson visited the hospital on November 25, 2014, complaining of "[s]uicidal ideations," and scheduled a follow-up visit for December 4, 2014). In any case, frequency of hospital visits does not necessarily correlate positively to a condition's severity, nor does it entail functional limitations significant enough to interfere with competitive employment. *Cf. Albertson v. Comm'r of Soc. Sec.*, 2016 WL 5661590, at *7 (E.D. Mich. Sept. 30, 2016) (upholding an ALJ decision denying benefits to a claimant whose "frequent visits to his physicians' offices and to the hospital emergency room" failed to produce evidence of a disabling condition); *Gamble v. Astrue*, No. 6:09-410-DCR, 2010 WL 2710470, at *4 (E.D. Ky. July 7, 2010) ("[T]he record supports the ALJ's determination that Gamble provided inconsistent statements regarding the frequency of seizures. Further, the objective medical reports of Gamble's condition following the 2007 incident indicate that he had significantly recovered shortly after the event."). This seems particularly true in light of evidence that Johnson regularly responded well to treatment, including her own statements. (Tr. 479) ("Pt reports that medications are helping her. Her psychosis, and depression are under control."); (Tr. 484) ("[P]t reports medications are helping her, . . ."); (Tr. 479) (same); (Tr. 615) ("Since the last visit status she has, overall, felt well with no notable interim problems."); (Tr. 530) ("She states she [has] been sleeping better with medication."). In short, the ALJ committed no error in assigning significant weight to Dr. Moten's opinion, and the evidence Johnson identifies as illustrating disability remains insufficient to demonstrate a depreciative change in circumstances from the operative prior RFC.

Second, Johnson argues that the record shows she is unable to do chores, shop, and cook without help from Kiesha. (Doc. 17 at ID 730). Because she "does not perform [activities of daily living] independently or on a consistent routine basis," Johnson seems to suggest that her difficulties in daily functioning should have been "marked" rather than "moderate," or at least represented that way in the RFC assessment. (Doc. 17 at ID 730). The ALJ's decision on this score, however, aligns with evidence from Dr. Moten, as well as medical sources indicating that Johnson remained capable of living independently and handling her own affairs, all of which is credited in the opinion. (Tr. 165); (Tr. 237) (Dr. Moten: describing Johnson's restriction of activities of daily living as "Moderate"); (Tr. 368) (noting Johnson's independence in "self care"); (Tr. 507) ("Consumer has the ability to live independently and handle her own affairs."). More to the point, Johnson does not articulate how this state of affairs represents a change in circumstances since the adjudicated period, which she must do if she wishes to evade the prior decision's preclusive effects. *See Wummel v. Comm'r of Soc. Sec.*, No. 12-14860, 2013 WL 6842571, at *5 (E.D. Mich. Dec. 27, 2013) ("[W]hen a claimant who has previously been adjudicated 'not disabled' seeks to avoid application of res judicata against him in a subsequent proceeding, he must bring forth proof that his condition has worsened wince the date of the prior decision to such a degree that he is no longer capable of engaging in substantial gainful activity."). Indeed, the prior decision found Johnson not disabled even though she "relie[d] upon her daughter to cook and clean." (Tr. 215); *see also* (Tr. 217) (rehashing Johnson's statements—during a period in which she was found *not* to be disabled—that "she had no motivation or energy to do things, and that her children (ages

29

16-21) did the household chores and cooking"). This particular objection, therefore, remains unpersuasive.

Third, Johnson suggests that her difficulty with social functioning likewise should have been recognized as marked, especially here where she "hardly leaves the house and her daily activity amounts to watching television." (Doc. 17 at 730-31). On this particular issue, as noted above, the ALJ modified the prior RFC—a decision which is valid only if the ALJ "offer[ed] proof showing that the claimant's condition ha[d] improved." *Wummel*, 2013 WL 6842571, at *5. Fortunately, the ALJ directs the reader to record evidence illustrating Johnson's strengthened aptitude to function independently, and her growing comfort interacting on a more regular basis with her daughters. *E.g.*, (Tr. 190) ("Sometimes I go to group."); (Tr. 376) (noting she spends the majority of her leisure time with her daughter); (Tr. 618) ("[J]udgment for everyday activities and social situations within normal limits."). Numerous other medical notes validate these findings with documented observations of Johnson's pleasant, personable demeanor. *E.g.*, (Tr. 432, 435, 459, 484, 529). This is not to say that Johnson proclaims a strong ability to interact with others in the community—she does not. *E.g.*, (Tr. 501) ("Consumer [says she] does not interact with anyone other than her daughters."). But alternative evidence on hand tends to show improvement in her social functioning. For this reason, the ALJ was permitted to modify the prior RFC assessment and find Johnson capable of occasional interaction with coworkers and occasional to superficial interaction with the general public.

Fourth, Johnson says that the "ALJ does not explain how simple, routine and repetitive tasks without a strict production pace would accommodate, . . . any interference from well-documented auditory hallucinations." (Doc. 17 at ID 731). Much like Johnson's objection to the ALJ's finding regarding her daily activities, however, Johnson does not indicate how or why these auditory hallucinations mark a departure from the previous adjudicated period in which she *also* suffered from auditory hallucinations, (Tr. 215), and  was found not disabled starting June 30, 2010. She also fails to identify how such hallucinations, however well documented, would limit her functional capacity in a manner not accommodated by work limited to routine and repetitive tasks without a strict production pace.

Finally, Johnson contends that the ALJ should have given greater consideration to the increased medication she was prescribed since "significant alterations in medications" may qualify as episodes of decompensation, which would presumably impact her RFC assessment. (Doc. 17 at 731-32). Nevertheless, medical records before the ALJ did not "disclose that [Johnson] had any exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning" as a result of her increased dosages. *Pratt v. Comm'r of Soc. Sec.*, No. 1:10-cv-438, 2012 WL 5845006, at *5 (W.D. Mich. Sept. 25, 2012); *accord Janis v. Comm'r of Soc. Sec.*, No. 14-10491, 2014 WL 6675298, at *6 (E.D. Mich. Nov. 25, 2014) (rejecting a similar argument regarding an increase in a claimant's dosage of Prozac from 20 to 40 mg. daily with a follow-up visit in six to eight weeks); *cf. Thompson v. Comm'r of Soc. Sec.*, No. 1:14-CV-0464, 2015 WL 5665142, at *14 (W.D. Mich. Sept. 24, 2015) (rejecting the argument that "missed counseling

sessions" fulfill the definition of episodes of decompensation); *Faust v. Astrue*, No. 12-cv-10412, 2012 WL 5411244, at *16 (E.D. Mich. Oct. 10, 2012) ("Faust notes only his and his mother's reports, and his testimony that he needed to take a number of breaks during the work day to remove himself from stressful situations around others, but he does not argue or offer any support showing that the combination of these breaks rise to the level of 'repeated episodes of decompensation' . . . ."). Indeed, her hospital visits do not necessarily coincide with increased medication, but rather the grief surrounding the holiday season and the anniversary of her son's murder. *E.g.*, (Tr. 562) (December 2013: noting that holidays are harder for her due to the absence of her son). Nor does her pattern of retaining monthly appointments with Dr. Purohit imply the "highly structured treatment for her mental health conditions" expected of an episode of decompensation. *Ayotte v. Comm'r of Soc. Sec.*, No. 2:14-CV-176, 2015 WL 5098418, at *3 (W.D. Mich. Aug. 31, 2015); *Janis*, 2014 WL 6675298, at *6 ("[I]f Dr. Mitchell believed that Janis was beginning an episode of decompensation, it stands to reason that he would have wanted to see Janis sooner than in six to eight weeks."). For this reason, Plaintiff's argument on this count remains unpersuasive.

In short, the ALJ's conclusion that the record showed improvement in Johnson's condition, and did not show degradation sufficient to justify an award of benefits, is supported by substantial evidence.

32

**H.       Conclusion**

For the reasons stated above, the Court **RECOMMENDS** that Johnson's Motion for Summary Judgment, (Doc. 17), be **DENIED**, the Commissioner's Motion, (Doc. 19), be **GRANTED**, and that this case be **AFFIRMED**.

**III.   <u>REVIEW</u>**

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed.

R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  December 20, 2016                    S/ PATRICIA T. MORRIS
                                            Patricia T. Morris
                                            United States Magistrate Judge


## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: December 20, 2016                    By s/Kristen Castaneda
                                           Case Manager